## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENNY ABRAMSON, individually and on behalf of all others similarly situated, <br><br>         Plaintiff, <br><br>     v. <br><br> AFFINITY FEDERAL CREDIT UNION, <br><br>         Defendant. | Case No. <br><br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY DEMAND** |

## CLASS ACTION COMPLAINT

Plaintiff, Jenny Abramson, individually and on behalf of herself and all others similarly situated, makes the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

### NATURE OF THE ACTION

1.      Plaintiff brings this action individually and on behalf of Classes of all similarly situated consumers against Defendant, Affinity Federal Credit Union ("Affinity"), arising from its routine practices of (a) assessing Overdraft Fees ("OD Fees") on transactions that did not actually overdraw checking accounts; and (b) charging two or more fees, including OD Fees and non-sufficient funds fees ("NSF Fees"), on a single item.

2.      Affinity misleadingly and deceptively misrepresents these practices in its own account contracts.

3.      This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief.

1

4.      As described herein, Affinity's practices violate New Jersey law, as well as Affinity's own form contracts.

5.      Affinity's improper scheme to extract funds from account holders has victimized Plaintiff and hundreds of other similarly situated consumers. Unless enjoined, Affinity will continue to engage in these schemes and will continue to cause substantial injury to its consumers.

## PARTIES

6.      Plaintiff Jenny Abramson is an individual and resident of Wake County, North Carolina, and has had a checking account with Affinity at all times material hereto.

7.      Defendant Affinity Federal Credit Union is a New Jersey credit union. It has approximately $7 billion in assets, maintains numerous branches throughout New Jersey, and maintains its headquarters at 73 Mountainview Boulevard, Basking Ridge, Somerset County, NJ 07920.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1333(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the members of the putative Class exceed $5 million, exclusive of costs, and at least one of the members of the proposed Class is a citizen of a different state than Affinity.

9.      The District of New Jersey has personal jurisdiction over Affinity because it maintains its headquarters here and regularly conducts business in this District.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to Plaintiff's claims arose here, including the creation of the scheme alleged in this Complaint.

## BACKGROUND FACTS

I.     **Affinity Charges OD Fees on Transactions that Do Not Actually Overdraw the Account**

### A.  Overview of Claim

11.     Plaintiff brings this action challenging Affinity's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions," or "APPSN Transactions."

12.     Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Affinity immediately reduces the consumer's checking account for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Affinity has already sequestered these funds for payment.

13.     However, Affinity still assesses crippling $33 OD Fees on many of these transactions and mispresents its practices in its account documents.

14.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Affinity later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN Transactions.

3

15.    Affinity maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Affinity sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the account holder and are specifically associated with a given debit card transaction.

16.    Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

17.    That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. Therefore, many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those previously authorized debit card transactions.

18.    Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Affinity improperly charges OD Fees on APPSN Transactions.

19.    The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.
>
> At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

20.    There is no justification for these practices, other than to maximize Affinity's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But Affinity is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does

the latter to the tune of millions of dollars each year. But Affinity was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APPSN Transactions.

21.     Besides being deceptive, unfair, and unconscionable, these practices breach promises made in Affinity's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Affinity's processes and practices. Affinity also exploits its contractual discretion by implementing these practices to gouge its customers.

22.     In plain, clear, and simple language, Affinity's contract promises that Affinity will only charge OD Fees on transactions that have insufficient funds to cover those transactions.

23.     Affinity is not authorized to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.  Mechanics of a Debit Card Transaction**

24.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Affinity. When a merchant or customer physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to Affinity, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

25.     At this step, if the transaction is approved, Affinity immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

26.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

27.     Affinity (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. After that, Affinity is obligated to pay the transaction no matter

6

what. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Affinity may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

28.     There is no change—no impact whatsoever—to the available funds in an account when Affinity transfers the funds that were previously held.

**C. Affinity's Account Contract**

29.     Plaintiff has an Affinity checking account, which is currently governed by Affinity's standardized "Member Service Agreement" ("Deposit Agreement"), attached hereto as Exhibit A.

30.     The Deposit Agreement states that overdrafts are determined at the time of authorization:

> Overdrafts - You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past.

Exhibit A at 3.

31.     Affinity promises to place an authorization hold on sufficient funds to pay the transaction at that time of authorization:

> A temporary debit authorization hold affects your account balance - On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the

actual amount of your purchase, but it may be up to three days before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee as disclosed on our fee schedule. You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase.

Exhibit A at 2.

32.      For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of a transaction, there are always funds to cover that same transaction—yet Affinity assesses OD Fees on it anyway.

33.      The above promises indicate that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN Transactions.

34.      In fact, Affinity actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

35.      The above representations and contractual promises are untrue. In fact, Affinity charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. Nothing in the Contract authorizes Affinity to impose OD Fees on APPSN Transactions.

36.      The Contract also misconstrues Affinity's true debit card processing and overdraft practices.

37.    First, and most fundamentally, Affinity charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions.

38.    Affinity assesses OD Fees on APPSN Transactions that do have sufficient funds available to cover them throughout their lifecycle.

39.    Affinity's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so.

40.    Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

41.    Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what Affinity does when it re-debits the account during a secret batch posting process.

42.    In reality, Affinity's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time of authorization and later at the time of settlement.

43.    At the time of settlement, however, an available balance *does not change at all* for transactions previously authorized into positive funds and for which sufficient funds were held. As such, Affinity cannot then charge an OD Fee on these transactions because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

44.    Upon information and belief, something more is going on: at the moment a debit card transaction is about to settle, Affinity does something new and unexpected during its middle of the night batch posting process. Specifically, Affinity releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

45.    This secret step allows it to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Affinity specifically set aside money to pay.

46.    This discrepancy between Affinity's actual practice and the Contract causes consumers like Plaintiff to incur improper and unlawful OD Fees.

47.    In sum, there is a huge gap between Affinity's practices as described in the account documents and Affinity's actual practices.

48.    Other banks and credit unions that employ this abusive practice disclose it expressly to their account holders and require them to agree to it—something Affinity here never did.

49.    Indeed, recognizing the complexity of the settlement process for APPSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, financial institutions generally provide express warnings that APPSN Transactions can incur OD Fees as well as explanations and examples of how such fees occur.

50.    For example, Bank of America's deposit agreement states:

Debit card transactions and related authorization holds may impact your available balance. It is important to know that your available funds may change between the time you authorize a transaction and when the transaction is paid. . . . **The amount being held is not applied to the debit card transaction. . . . If other account activity has caused the funds available in your account to drop below zero before the debit card transaction is paid, you may no longer have sufficient funds to pay the merchant**. . . .

Here is an example of how that may happen: On Monday we authorize a debit card transaction because you have enough available funds at the time. A hold is then placed on your funds until the merchant presents the transaction for payment. On Tuesday we process and post another transaction (such as a check you wrote) that reduces your available funds below zero. If the merchant presents the original debit card transaction for payment on Wednesday, and your available funds are now below the amount needed to pay the transactions, the debit card transaction will overdraw your account and you may incur an overdraft fee.

10

*Deposit Agreement and Disclosure*, Bank of America 18 (Nov. 1, 2019),

https://www.bankofamerica.com/deposits/resources/deposit-agreements.go (emphasis added).

51.     As another example, Canvas Credit Union states:

Available balance **at the time transactions are posted (not when they are authorized)** may be used to determine when your account is overdrawn.  The following example illustrates how this works:

Assume your actual and available balance are both $100, and you swipe your debit card at a restaurant for $60.  As a result, your available balance will be reduced by $60 so your available balance is only $40.  Your actual balance is still $100.  Before the restaurants charge is sent to us for posting, a check that you wrote for $50 clears.  Because you have only $40 available. . . . your account will be overdrawn by $10, even though your actual balance was $100 before the check posted. .  . **Also**, when the $60 restaurant charge is presented to the Canvas and posted to your account, you will not have enough money in your available balance because of the intervening check, and you will be charged a fee for that transaction as well, **even though your available balance was positive when it was authorized.**

*Member Service Agreement, Part 2*, Canvas Credit Union 30 (Nov. 5, 2019),  https://cdn.

canvas.org/files/content/pdf/MSA_Part_2-CanvasCU-Std_Size-11-05-19.pdf (emphases in

original).

52.     Capital One's deposit agreement similarly states:

**Other intervening transactions that occur while authorized debit card transactions are pending may create overdrafts on your account.** Here is an example of how that could happen:

You're enrolled in our optional overdraft service. Your account balance is $100.00. On Monday, you go to the store and use your debit card to make a purchase for $80.00. We authorize the transaction; however, the merchant doesn't send us the transaction for payment and posting to your account on that day. On Tuesday, you withdraw $30.00 from an ATM, reducing your account balance to $70.  **On Wednesday, the merchant requests payment for the $80.00 transaction authorized on Monday, and you're charged a fee because the balance in your account is insufficient to pay the transaction at that time.**

*Rules Governing Deposit Accounts*, Capital One (Nov. 7, 2018),  https://www.capitalone.com/bank/rules-governing/disclosures/ (emphasis added).

53.    Affinity provides no such disclosure, and instead makes contractual promises that deceive its account holders.

### D.  Affinity Abuses Contractual Discretion

54.    Affinity's practice of charging OD Fees on APPSN Transactions is not simply a breach of the express terms of the Contract; Affinity's OD Fee practices also exploit contractual discretion to the detriment of account holders.

55.    The term "to honor" a transaction is not defined in the account documents. Affinity uses its discretion to define "to honor" in a manner contrary to any reasonable, common sense understanding of that term. In Affinity's implied definition, a balance is insufficient to "honor" a transaction even if Affinity sequesters sufficient available funds for that transaction at the time it is made.

56.    Moreover, Affinity uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume the funds previously sequestered for APPSN Transactions.

57.    Affinity uses all of these contractual discretion points unfairly to extract OD Fees on transactions that no reasonable consumer would believe could cause OD Fees.

### E.  Plaintiff's Debit Card Transactions

58.    As examples, on October 9, 2018, October 23, 2018, and September 19, 2018, Plaintiff was assessed OD Fees on debit card transaction, despite the fact that the transactions had been authorized, prior to that day, on a sufficient available balance.

## II.    AFFINITY CHARGES TWO OR MORE FEES ON THE SAME ITEM

59.    As alleged more fully herein, Affinity's Account Documents allow it to take certain steps when its accountholders attempt a transaction but does not have sufficient funds to cover it.  Specifically, Affinity may (a) authorize the transaction and charge a *single* OD Fee; or (b) reject the transaction and charge a *single* NSF Fee.

60.    In contrast to its Account Documents, however, Affinity regularly assesses two or more fees on the *same* item.

61.    This abusive practice is not universal in the financial services industry.  Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one fee on the same item when it is reprocessed.  Instead, Chase charges one fee even if a transaction is resubmitted for payment multiple times.

62.    Affinity's Account Documents never disclose this practice. To the contrary, Affinity's Account Documents indicate it will only charge a single fee on an item or per transaction.

**A.    *Plaintiff's Experience***

63.    In support of her claims, Plaintiff offers an example of fees that should not have been assessed against her checking account. As alleged below, Affinity: (a) reprocessed a previously declined transaction; and (b) charged an additional fee upon reprocessing, for a total assessment of two fees on a single item.

64.    On December 20, 2018, Plaintiff attempted to make an ACH payment.

65.    Affinity rejected payment of that transaction due to insufficient funds in Plaintiff's account and charged her a $33 NSF Fee for doing so.  Plaintiff does not dispute the initial fee, as it is allowed by Affinity's Account Documents.

66.     Unbeknownst to Plaintiff and without her request to do so, a day later, on December 21, 2018, Affinity processed the same item yet again, as shown by the fact that it was coded a RETRY PYMT, but this time, and charged Plaintiff another $33 NSF Fee.

67.     Then, on December 24, 2018, Affinity processed the same item *yet again*, and charged Plaintiff another $33 NSF Fee.

68.     In sum, AFFINITY assessed Plaintiff $99 in fees to attempt to process a single payment.

69.     Plaintiff understood the payment to be a single item as is laid out in Affinity's contract, capable at most of receiving a single NSF Fee (if Affinity returned it) or a single OD Fee (if Affinity paid it).

**B.**     ***The Imposition of Multiple Fees on a Single Item Violates Affinity's Express Promises and Representations***

70.     The Account Documents provide the general terms of Plaintiff's relationship with Affinity and therein Affinity makes explicit promises and representations regarding how transactions will be processed, as well as when NSF Fees and OD Fees may be assessed.

71.     The Account Documents contain explicit terms indicating that fees will only be assessed once per check or item when in fact Affinity regularly charges two or more fees per check or item even though a customer only requested the payment or transfer once.

72.     Affinity's Account Documents indicate that a singular fee can be assessed per item.

73.     Specifically, the Account Agreement states:

If an item is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item (NSF).

Exhibit A at 7.

74.    Likewise, another of the Account Documents, the Fee Schedule, attached hereto as Exhibit B, states:

**Insufficient** funds (whether paid or returned)                                    $33 per transaction
*(Check, ACH, Debit Card, and ATM)*

Exhibit B.

75.    Affinity's Account Documents indicate that it will charge a single fee per "item" or "transaction" that is returned due to insufficient funds.

76.    The same "item" or "transaction" cannot conceivably become a new one each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit it.

77.    There is zero indication anywhere in the account documents that the same "item" or "transaction" is eligible to incur multiple fees.

78.    Even if Affinity reprocesses an instruction for payment, it is still the same item or transaction.  Affinity's reprocessing is simply another attempt to effectuate an accountholder's original order or instruction.

79.    The disclosures described above never discuss a circumstance where Affinity may assess multiple fees for a single check or ACH transaction that was returned for insufficient funds and later reprocessed one or more times and returned again.

80.    In sum, Affinity promises that one fee will be assessed per electronic payment or check, and these terms must mean all iterations of the same instruction for payment.

81.    As such, Affinity breached the contract when it charged more than one fee per single item.

82.    Reasonable consumers understand any given authorization for payment to be one, singular "item," as those terms are used in Affinity's Account Documents.

83.    Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same transaction will be treated as the same "item," which Affinity will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account.   Nowhere does Affinity disclose that it will treat each reprocessing of a check or ACH payment as a separate item, subject to additional fees, nor do Affinity customers ever agree to such fees or practices.

84.    Customers reasonably understand, based on the language of the Account Documents and Affinity's other documents, that the credit union's reprocessing of checks or ACH payments are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger NSF Fees. In other words, it is always the same item.

85.    Banks and credit unions like Affinity that employ this abusive practice know how to plainly and clearly disclose it.  Indeed, other banks and credit unions that do engage in this abusive practice disclose it expressly to their accountholders—something Affinity never did.

86.    For example, First Citizens Bank, a major institution in the Carolinas, engages in the same abusive practice as Affinity, but at least expressly states:

> Because we may charge a service fee for an NSF item each time it is presented, **we may charge you more than one service fee for any given item**. All fees are charged during evening posting. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

(emphasis added).

87.    First Hawaiian Bank engages in the same abusive practices as Affinity, but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**.

(emphasis added).

88.    Central Pacific Bank, a leading bank in Hawai'i, states in its Fee Schedule under the "MULTIPLE NSF FEES" subsection: "Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, may be resubmitted one or more times for payment, and a $32 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds."

89.    BP Credit Union likewise states: "Your account may be subject to a fee for each item regardless of whether we pay or return the item. We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item."

90.    Regions Bank likewise states:

If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item.

https://www.regions.com/virtualdocuments/Deposit_Agreement_6_1_2018.pdf.

91.    Andrews Federal Credit Union states:

You understand and agree that a merchant or other entity may make multiple attempts to resubmit a returned item for payment. Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the

number of times an item is submitted or resubmitted to use for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

https://www.andrewsfcu.org/AndrewsFCU/media/Documents/Terms-and-Conditions_REBRANDED_Dec2019-Update.pdf

92.     Consumers Credit Union states:

Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

https://www.myconsumers.org/docs/default-source/default-document-library/ccu_membership_booklet_complete.pdf?sfvrsn=6

93.     Wright Patt Credit Union states:

Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and represented regardless of the number of times an item is presented or represented to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

https://www.wCUW.coop/en-us/PDFDocuments/Important%20Account%20Information%20Disclosure%20-%20WCUW.pdf

94.     Railroad & Industrial Federal Credit Union states:

Consequently, because we may charge an NSF fee for an NSF item each time it is presented, we may charge you more than one NSF fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

https://www.rifcu.org/Documents/Disclosures/Account-Terms-Conditions.aspx

95.     Partners 1st Federal Credit Union states:

Consequently, because we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or

resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

https://www.partners1stcu.org/uploads/page/Consumer_Account_Agreement.pdf

96.    Members First Credit Union states:

We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once** . . . we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment [.]

http://www.membersfirstfl.org/files/mfcufl/1/file/Membership_and_Account_Agreement.pdf

97.    Community Bank, N.A. states:

We cannot dictate whether or not (or how many times) a merchant will submit a previously presented item. You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned.

https://cbna.com/u/header/2019-Overdraft-and-Unavailable-Funds-Practices-Disclosure.pdf

98.    RBC Bank states:

We may also charge against the Account an NSF fee for each item returned or rejected, including for multiple returns or rejections of the same item.

https://www.rbcbank.com/siteassets/Uploads/pdfs/Service-Agreement-for-Personal-Accounts.pdf

99.    Diamond Lakes Credit Union states:

Your account may be subject to a fee for each item regardless of whether we pay or return the item. We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item.

https://www.diamondlakesfcu.org/termsconditions.html

100.    Parkside Credit Union states:

If the Credit Union returns the item, you will be assessed an NSF Fee. Note that the Credit Union has no control over how many times an intended payee may

resubmit the same check or other item to us for payment. In the event the same check or other item is presented for payment on more than one occasion, your account will be subject to an additional charge on each occasion that the item is presented for payment. There is no limit to the total fees the Credit Union may charge you for overdrawing your account.

https://www.parksidecu.org/_/kcms-doc/1043/44277/Membership-and-Account-Agreement.pdf?__cf_chl_captcha_tk__=add6ebea42df3385074decd4b16c1f86a8369dc9-1580434763-0-AfXmB7FcyYTqzK9oMNbMSKM6k5fnKS5Xf-z7p3Tv-Pt951tDs7wM8yaaIV06w718t2nomyWR1Q8COwgpfgE07FJWZUeFkJN6lxbXDZG1Svid-TWhYm9l85AbCd5afw2imyGdtdzKhXl9bQ9TYkjOlTVM4w8OFJOtE3wVIHrEITn-QnSfoR5-mZxM5O0bu4f_FHoHiJj0XsjNkVoGblk0-lti6-gMnWcu_o87SGQW6dOUF2i6rHGiM_CkdI-ULanKI2NS3KlhkYAuNatN9Jdwr7Plc6oJozMbZ-QeczuO7VlbRnuCFD0tjzkw1lsnof7uaRvLRAkfKYi3wh0tUU1c_-Y6N4aH1qN8SPftOn8TYJHO7OoILvpMfamNTqv_djpbUl3GVA

101.    First Financial Bank in Ohio, aware of the commonsense meaning of "item,"

clarifies the meaning of that term to its accountholders:

> Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment). Each presentment is considered an item and will be charged accordingly.

https://www.bankatfirst.com/content/dam/first-financial-bank/eBanking_Disclosure_of_Charges.pdf (last accessed September 18, 2019).

102.    Affinity provides no such disclosure, and in so doing, deceives its accountholders.

## C.    *The Imposition of Multiple Fees on a Single Transaction Breaches Affinity's Duty of Good Faith and Fair Dealing*

103.    Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with a discretionary power over the other party. This creates an implied promise to act in accordance with the parties' reasonable expectations and means that Affinity is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, Affinity has a duty to honor transaction requests in a way that

is fair to Plaintiff and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties on the depositor.

104.    Here—in the adhesion agreements Affinity foisted on Plaintiff and its other customers— Affinity has provided itself numerous discretionary powers affecting customers' credit union accounts.  But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Affinity abuses that discretion to take money out of consumers' account without their permission and contrary to their reasonable expectations that they will not be charged multiple fees for the same transaction.

105.    Affinity abuses the power it has over customers and their credit union accounts and acts contrary to reasonable expectations under the Account Documents when it construes the words "item" and "transaction" to mean each iteration of the same payment.  This is a breach of Affinity's implied covenant to engage in fair dealing and to act in good faith.

106.    Further, Affinity maintains complete discretion not to assess fees on transactions at all.  By exercising its discretion in its own favor—and to the prejudice of Plaintiff and other customers—by charging more than one fee on a single item, Affinity breaches the reasonable expectation of Plaintiff and other customers and in doing so violates the implied covenant to act in good faith.

107.    It was bad faith and totally outside Plaintiff's reasonable expectations for Affinity to use its discretion to assess two or more fees for a single attempted payment.

108.    When Affinity charges multiple fees, Affinity uses its discretion to define the meaning of "item" and "transaction" in an unreasonable way that violates common sense and reasonable consumer expectations.  Affinity uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more fees

## CLASS ACTION ALLEGATIONS

109.    *Description of the Classes*: Plaintiff brings this action individually and on behalf of the following classes of persons:

> All Affinity accountholders who, during the applicable statute of limitations, were charged OD Fees on APPSN transactions (the "APPSN class").

> All Affinity accountholders who, within the applicable statute of limitations period, were charged Multiple Fees for the same item (the "Multiple Fee Class").

110.    Excluded from the Classes are Affinity's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns. Also excluded from the Class are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

111.    The time period for the Classes is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Affinity remedies the conduct complained of herein.

112.    *Numerosity*: The members of the proposed Classes are so numerous that individual joinder of all members is impracticable. The exact number and identities of the members of the proposed Classes are unknown at this time and can be ascertained only through appropriate discovery. Plaintiff estimates the number of members in each Class to be in the thousands.

113.    *Commonality and Predominance*: There are many questions of law and fact common to Plaintiff and the Class, and those questions substantially predominate over any questions that may affect individual Class members. Common questions of law and fact include:

    a.  Whether Affinity charged OD Fees on transactions that did not overdraw an account;

    b.  Whether Affinity charged multiple fees on the same item;

    c.  Whether Affinity breached its own contract by charging OD Fees on transactions that did not overdraw an account and by charging multiple fees on the same item;

    d.  Whether Affinity breached the covenant of good faith and fair dealing;

    e.  The proper method or methods by which to measure damages; and

    f.  The declaratory and injunctive relief to which the Class is entitled.

114.   *Typicality:* Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have been similarly affected by Affinity's actions.

115.   *Adequacy of Representation*: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex and consumer class action litigation. Plaintiff and Plaintiff's counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.

116.   *Superiority of Class Action*: Plaintiff and the members of the Class suffered, and will continue to suffer, harm as a result of Affinity's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Class is impractical. Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Affinity's common course of conduct. The class action device allows for unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single

forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system and protects the rights of the Class members.

117.    *Risk of Inconsistent or Varying Adjudication*: Class action treatment is proper, and this action should be maintained as a class action because the risks of separate actions by individual members of the Class would create a risk of: (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Affinity as the party opposing the Class; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impede their ability to protect their interests.

118.    *Action Generally Applicable to Class as a Whole*: Affinity, as the party opposing the Class, has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## FIRST CLAIM FOR RELIEF
## Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing
## (On Behalf of Plaintiff and the Classes)

119.    Plaintiff incorporates by reference the preceding paragraphs.

120.    Plaintiff and Affinity have contracted for banking services, as embodied in Affinity's account documents.

121.    All contracts entered by Plaintiff and the Class are identical or substantively identical because Affinity's form Contracts were used uniformly.

122.    Affinity has breached the express terms of its own agreements as described herein.

123.    Under New Jersey law, good faith is an element of every contract between banks and/or credit unions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

124.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

125.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

126.    Affinity abused the discretion it granted to itself when it charged OD Fees on transactions that did not overdraw an account and when it charged multiple fees on the same item.

127.    In these and other ways, Affinity violated its duty of good faith and fair dealing.

128.    Affinity willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the Class.

129.    Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

130.    Plaintiff and members of the Class have sustained damages as a result of Affinity's breaches of the parties' Contracts and breaches of contract through violations of the covenant of good faith and fair dealing.

## SECOND CLAIM FOR RELIEF
### Violation of the New Jersey Consumer Fraud Act, N.J. STAT. ANN. § 56:8-1 *et.seq.* (On Behalf of Plaintiff and the Classes)

131.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth verbatim and at length herein.

132.    Defendant's representations regarding its overdraft fee practices and insufficient funds fee practices are false, deceptive and misleading, as described above.

133.    Contrary to its representations, Affinity does in fact assess overdraft fees on debit card transactions authorized on a positive balance. Further, contrary to its representations, Affinity does in fact assess multiple fees on the same item.

134.    Defendants' violation of the New Jersey Consumer Fraud Act caused Plaintiff and putative Class members to suffer ascertainable losses.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully request that the Court:

a.    Certify this case as a class action, designating Plaintiff as class representative and designating the undersigned as Class Counsel;

b.    Award Plaintiff and the Class actual, statutory, and punitive damages in an amount to be proven at trial;

c.    Award Plaintiff and the Class restitution in an amount to be proven at trial;

26

d. Award Plaintiff and the Class pre-judgment interest in the amount permitted by law;

e. Award Plaintiff and the Class attorneys' fees and costs as permitted by law;

f. Declare Affinity's practices outlined herein to be unlawful and a breach of contract;

g. Enjoin Affinity from engaging in the practices outlined herein;

h. Grant Plaintiff and the Class a trial by jury;

i. Grant leave to amend these pleadings to conform to evidence produced at trial; and

j. Grant such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, by counsel, demands trial by jury.

Dated: September 23, 2020

WILENTZ, GOLDMAN & SPITZER, P.A.

By:    */s/ Kevin P. Roddy*
       KEVIN P. RODDY
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
E-mail:  kroddy@wilentz.com

THE KICK LAW FIRM, APC
TARAS KICK*
JEFFREY C. BILS*
815 Moraga Drive
Los Angeles, CA  90049
Telephone:  (310) 395-2988
E-mail:  taras@kicklawfirm.com
             jeff@kicklawfirm.com

KALIEL PLLC
JEFFREY KALIEL*
SOPHIA GOLD*
1875 Connecticut Ave. N.W., 10th Floor
Washington, D.C. 20009
Telephone:  (202) 350-4783
E-mail:  jkaliel@kalielpllc.com
           sgold@kalielpllc.com

*Pro Hac Vice Motions to be Filed

**Attorneys for Plaintiff and the Proposed Class**